IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| SHARYL L. SOURIS, | ) | CASE NO. 1:20-cv-00630 |
|---|---|---|
| Plaintiff, | ) ) | MAGISTRATE JUDGE |
| v. | ) ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Sharyl L. Souris ("Plaintiff" or "Souris") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 16.

For the reasons explained herein, the Court finds that the ALJ either overlooked or misconstrued evidence relating to Souris' subjective allegations relating to urinary frequency and, without a more thorough analysis, the Court is unable to conduct a meaningful assessment as to whether the ALJ's assessment of Souris' subjective allegations regarding her urinary frequency and/or the RFC assessment are supported by substantial evidence. Accordingly, the

Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

## I. Procedural History

On March 19, 2014, Souris protectively filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Tr. 120, 133, 151, 286-289. Souris alleged a disability onset date of December 15, 2012. Tr. 14, 122, 135, 151, 286, 305. She alleged disability due to osteoarthritis, lumbar and cervical spine pain, and alpha antitrypsin. Tr. 121, 134, 168, 180, 362.

After initial denial by the state agency (Tr. 168-174) and denial upon reconsideration (Tr. 180-184), Souris requested a hearing (Tr. 185). A hearing was held before an Administrative Law Judge ("ALJ") on January 13, 2017. Tr. 73-119. On May 30, 2017, the ALJ issued an unfavorable decision (Tr. 148-162), finding that Souris had not been under a disability, as defined in the Social Security Act, from March 19, 2014, through the date of the decision (Tr. 151, 157). Souris asked the Appeals Council to review the ALJ's decision (Tr. 165), and, on February 8, 2018, the Appeals Council found that the ALJ had adjudicated the claim from the protective filing date of March 19, 2014, but should have adjudicated the claim for the entire period at issue, i.e., from the alleged onset date of December 15, 2012 (Tr. 165). Thus, the Appeals Council remanded the case for further proceedings before an ALJ. Tr. 163-167.

On remand, the ALJ conducted a second hearing on October 17, 2018. Tr. 32-72. Thereafter, on November 20, 2018, the ALJ issued an unfavorable decision (Tr. 9-31), finding that Souris had not been under a disability, as defined in the Social Security Act, from December 15, 2012, through the date of the decision (Tr. 13, 22). On January 23, 2020, the Appeals

Council denied Souris' request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence[1]

### A. Personal, vocational and educational evidence

Souris was born in 1958. Tr. 45, 87, 121. She is a high school graduate. Tr. 46, 88. Souris' past work included a job at a gas station for about 10 years where she worked as cashier and manager at the gas station. Tr. 46. As far as her managerial duties, Souris scheduled other employees for work and checked their paperwork. Tr. 48-49. Souris also worked as a cleaner and kitchen worker/prep cook at a bar/restaurant. Tr. 49-54.

### B. Medical evidence

#### 1. Treatment history

On March 31, 2015, upon referral by her primary care physician, Dr. Gary Dinger, D.O., Souris saw Dr. William Larchian, M.D., in the urology department at University Hospitals for evaluation and treatment of gross hematuria.[2] Tr. 959. Souris did not report having pain with her hematuria. Tr. 959. Souris complained of urinary incontinence that was worse with coughing, sneezing, laughing, exercise and a full bladder. Tr. 960. She also complained of nocturia, three times per night. Tr. 960. Testing was negative, with the exception of a urinalysis showing 68 red blood cells. Tr. 961. Dr. Larchian recommended a cystoscopy. Tr. 962.

On April 21, 2015, Dr. Larchian performed the cystoscopy. Tr. 963-967. Dr. Larchian indicated that the cystoscopy showed significant erythema along the lower half of Souris'

---

[1] The evidence summarized herein relates primarily to Souris' interstitial cystitis since her sole argument in this appeal pertains to the ALJ's evaluation and consideration of that medical condition.

[2] When blood in urine is visible it is referred to as gross hematuria. https://www.mayoclinic.org/diseases-conditions/blood-in-urine/symptoms-causes/syc-20353432 (last visited 6/30/2021)

bladder. Tr. 967. During the April 21, 2015, visit, Souris reported urinary frequency and pressure every 30 minutes. Tr. 967. Based on Souris' reports that she was urinating every 45 minutes during the day, Dr. Larchian started Souris on a trial of Toviaz. Tr. 967. He recommended further follow up in three months. Tr. 967.

Souris saw Dr. Larchian for a follow-up visit and cystoscopy on July 21, 2015. Tr. 696-700. The cystoscopy showed improvement – there was moderate erythema throughout the bladder but the erythema was still present. Tr. 699, 700. Souris continued to report urgency and incontinence. Tr. 700. Dr. Larchian noted that Souris had "tried Detrol LA which increased her nocturia and increased her frequency to once an hour in the daytime." Tr. 700. Also, he noted that, when Souris tried Vesicare, "she had a significant shortness of breath" so that medication was stopped. Tr. 700. Dr. Larchian had recommended Toviaz. Tr. 700. However, Souris was hesitant about trying a new medication and continued to take Detrol LA. Tr. 700. Since Souris was continuing to have frequency every hour, Dr. Larchian recommended that Souris start a trial of Myrbetriq 50 mg. Tr. 700. If Souris experienced side effects from the Myrbetriq, Dr. Larchian indicated that he would switch her back to the Detrol LA. Tr. 700.

Souris returned to see Dr. Larchian for an annual follow up and cystoscopy on July 27, 2016. Tr. 975-982. The cystoscopy showed improved erythema. Tr. 981. Souris continued to have urgency, frequency, and nocturia. Tr. 981. She had a mild urinary tract infection that they planned to treat with medication. Tr. 981. Souris had tried various medications that caused side effects or did not help. Tr. 981. For example, Oxybutynin caused dry mouth, Detrol did not help with incontinence, Vesicare did not help, Toviaz caused increased frequency and nocturia, and Myrbetriq was too expensive. Tr. 981. Dr. Larchian discontinued the Detrol at that time and recommended that Souris follow up with a nurse practitioner in a month for evaluation of

intravesical injections of Botox and, possible referral to Dr. Hijaz for further evaluation and treatment. Tr. 981.

In December 2016, Souris saw Dr. Larchian for a follow-up appointment. Tr. 973. Souris was continuing to take Detrol even though she continued to have frequency, urgency, and nocturia. Tr. 973.

Souris returned for an annual follow-up appointment with Dr. Larchian on July 19, 2017. Tr. 968-974. Souris relayed that Detrol had eliminated her pelvic cramping but she still had urgency, frequency, and incontinence. Tr. 973. Souris was interested in proceeding with a consultation with Dr. Hijaz. Tr. 973. Dr. Larchian referred Souris to Dr. Hijaz to discuss other options that might be available. Tr. 974. Dr. Larchian continued Souris on Detrol and instructed her to return to see him in a year for follow-up testing. Tr. 974.

Souris saw Dr. Adonis Hijaz, M.D., in the urology department at University Hospitals on September 1, 2017. Tr. 752-757. Souris reported voiding every 35 minutes during the day and voiding twice at night. Tr. 752. She relayed to Dr Hijaz that Dr. Larchian had told her that there was evidence of cystitis on her cystoscopy. Tr. 752. Souris relayed that she did not have pain with her bladder filling but she did "feel symptoms of pressure sensation that transfer to void." Tr. 752. Also, she had stress incontinence with coughing, laughing, and sneezing, which caused her to need to wear one pad per day. Tr. 752. On examination, Dr. Hijaz noted "tenderness on palpation of the base of the bladder and palpation of the levator muscles[,]" with "[t]he tenderness on palpation of the base of the bladder . . . more pronounced." Tr. 757. Dr. Hijaz

started Souris on Elavil for a diagnosis of interstitial cystitis.[3]  Tr. 757.  He also continued her on Detrol and referred her for pelvic floor physical therapy.  Tr. 757.

Souris saw Dr. Hijaz again on September 29, 2017.  Tr. 759-763.  Souris relayed that, initially, she had "remarkable improvement in [her] urinary frequency at night on Elavil 10 mg."  Tr. 763.  The medication had decreased her nighttime frequency from three times to one time per night.  Tr. 759.  Also, the Elavil helped with her urgency at night.  Tr. 759.  However, Souris had started to notice an increase in her frequency at night and she was continuing to have overactive bladder symptoms during the day.  Tr. 759, 763.  Dr. Hijaz increased Souris' Elavil dose to 20 mg at night.  Tr. 763.  Souris had not been able to get in to see a physical therapist.  Tr. 759.  Dr. Hijaz instructed Souris to continue to try to get in to see a physical therapist.  Tr.  759, 763.

In October and November 2017, Souris attended physical therapy for her overactive bladder.[4]  Tr. 1034-1053.

On February 8, 2018, Souris returned to the urology department at University Hospitals for a follow up regarding her interstitial cystitis and urgency.  Tr. 764-769.  Souris saw Elizabeth Bucher, APRN-CNP.  Tr. 764.  Souris reported having minimal leakage at that time.  Tr. 764.  As had happened initially with 10 mg of Elavil, Souris reported that, with 20 mg of Elavil, she had improvement but then returned to baseline.  Tr. 764.  Nurse Bucher increased Souris' Elavil to 30 mg and noted that they would monitor her symptoms.  Tr. 768.  Nurse Bucher also recommended a trial of Myrbetriq, noting that it had previously been too expensive.  Tr. 768.  Souris was instructed to discontinue Detrol and follow up in three to four months.  Tr. 768.

---

[3] "IC [interstitial cystitis] is a complex genitourinary disorder involving recurring pain or discomfort in the bladder and pelvic region." Social Security Ruling 15–1p, 2015 WL 1292257, at *2 (Mar. 18, 2015).  IC may also be referred to as "bladder pain syndrome" and "painful bladder syndrome."  *Id.*

[4] At the physical therapy visits, Souris also received therapy for an achilles tendon strain.  Tr. 1034-1053.

6

## 2. Opinion evidence

On July 24, 2014, Dr. Khalid Darr, M.D., conducted a consultative examination. Tr. 663-671. At that time, Souris reported no history of bladder or bowel dysfunction. Tr. 663. Dr. Darr opined that Souris was "able to sit, stand, carry and lift between 20 and 50 pounds frequently and over 50 pounds occasionally." Tr. 667. Dr. Darr further indicated that Souris' "activities of daily living and instrumental activities of daily living seem to be intact." Tr. 667.

On August 13, 2014, state agency reviewing consultant Leslie Green, M.D., completed a physical RFC assessment. Tr. 129-130. Dr. Green opined that Souris had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; and sit for a total of about 6 hours in an 8-hour workday. Tr. 129. Dr. Green opined that Souris' ability to push/pull was unlimited, other than as indicated for the lift and/or carry limits. Tr. 129. With respect to postural limitations, Dr. Green opined that Souris' ability to balance was unlimited; she could never climb ladders/ropes/scaffolds; and she could frequently climb ramps/stairs, stoop, kneel, crouch, and crawl. occasionally stoop and crawl; and frequently climb ramps/stairs, kneel and crouch. Tr. 130. Dr. Green found no manipulative, visual, communicative, or environmental limitations. Tr. 130.

Upon reconsideration, on September 30, 2015, state agency reviewing consultant Gail Mutchler, M.D., completed a physical RFC assessment, affirming Dr. Green's RFC assessment, with the exception of the postural limitations. Tr. 143-144. Dr. Mutchler concluded that Souris could only occasionally, rather than frequently, stoop, kneel, and crouch. Tr. 144. As part of her explanation for the light level exertional limitations, Dr. Mutchler noted that there was evidence

7

of "[f]requent urination (with blood)[.]" Tr. 143. However, Dr. Mutchler also noted that there was "insufficient evidence MER [medical evidence of record][.]" Tr. 143.

## C. Testimonial evidence

### 1. Plaintiff's testimony

Souris testified at both hearings. Tr. 73-119 (January 13, 2017, hearing); Tr. 32-72 (October 17, 2018, hearing). At the first hearing, Souris' representative/advocate was Dr. Daniel Ducatt, a retired physician. Tr. 76-77. At the second hearing, Souris' representative was Attorney Jon Ressler. Tr. 35. During both hearings, Souris needed to excuse herself to use the bathroom. Tr. 62, 115-116, 117.

*First hearing*

When asked what prevented her from working, Souris relayed that it was because of problems with her back and because she constantly had to go to the bathroom. Tr. 97-98. She stated she might have to go to the bathroom within a half an hour after she just went and sometimes as soon as ten minutes after. Tr. 98. To minimize how often she has to go to the bathroom, Souris relayed that she tries not to drink a lot. Tr. 98.

Souris explained that she was diagnosed with bladder pain syndrome/interstitial cystitis by Dr. Larchian in July 2016. Tr. 101. Souris normally saw Dr. Larchian yearly but, following her diagnosis in July 2016, she was seeing him more often because they were trying to figure out a treatment plan. Tr. 101-102. One option that was being considered was Botox. Tr. 102. Every year she had a cystoscopy. Tr. 102.

Souris indicated that her urinary frequency (needing to go to the bathroom every 30 minutes) had been occurring since early 2015, which was around the time that she sought treatment for blood in her urine. Tr. 102-103. Souris wears protective padding for times when

8

she is unable to get to a bathroom in time. Tr. 103, 107. She estimated using five pads during the day. Tr. 107. When Souris has to go to the bathroom, she has discomfort. Tr. 108. Souris normally wakes up when she has to go to the bathroom at night and does not have accidents. Tr. 107. Her bathroom is about ten feet from her bed. Tr. 107.

Souris has tried various medications – each with different side effects. Tr. 104. There was one medication that her doctor indicated would not cause side effects but it was too expensive. Tr. 104. She was taking the one medication that had the least amount of side effects. Tr. 104. However, she did not feel that it helped. Tr. 104.

*Second hearing*

Souris indicated, that, since the first hearing, nothing had changed with respect to her interstitial cystitis and having to use the bathroom all the time. Tr. 56-57. Souris indicated she was on medication that was "not . . . the right medication" but it helped "somewhat." Tr. 57. She indicated that she still had to go to the bathroom "a lot." Tr. 57. When asked what "a lot" meant, Souris indicated that "[a] lot [was] like every hour." Tr. 57-58. She stated, "[a]t night, [she] [is] up every single hour without fail, between an hour and an hour and 15 minutes, every night unless [she] take[s] medication[.]" Tr. 58. Souris explained, however, that she could not take her medication at night if she had to get up in the morning because her medication made her very groggy and gave her bad headaches. Tr. 58. During the day, Souris indicated she had to go to the bathroom about every 35 minutes. Tr. 58. Souris drank only a sip of water before attending the hearing, went to the bathroom before driving to the hearing, and had to go to the bathroom once she arrived for the hearing. Tr. 58.

2. **Vocational expert's testimony**

A Vocational Expert ("VE") testified at both the first (Tr. 111-118) and second hearing (Tr. 58-70).

At the second hearing, the VE described Souris' past work as a cashier-checker as a semi-skilled, light level job, as described in the DOT and as performed by Souris. Tr. 59. He described her cleaning job as commercial cleaner, which was an unskilled, heavy level job as described in the DOT but a medium level job as performed by Souris. Tr. 59-60. The VE described Souris' work as a prep cook as a cook helper position that was a skilled, medium level job as described in the DOT but a light level job as performed by Souris. Tr. 60.

In response to a hypothetical question mirroring the RFC that the ALJ ultimately assessed, the VE indicated that the described individual would be able to perform Souris' past job as a cashier-checker. Tr. 60. The VE also identified other jobs that the described individual could perform, i.e., inspector and hand packager, electronics worker, and mail clerk. Tr. 61-62.

In response to questioning by Souris' counsel, the VE indicated that a limitation of needing to take five-minute bathroom breaks, three times during every two-hour time period, would be work preclusive. Tr. 65.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[5] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[6] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[7] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[7] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his November 20, 2018, decision, the ALJ made the following findings:[8]

1. Souris meets the insured status requirements of the Social Security Act through September 30, 2017. Tr. 14.

2. Souris has not engaged in substantial gainful activity since December 15, 2012, the alleged onset date. Tr. 14.

3. Souris has the following severe impairments: degenerative disc disease of the cervical and lumbar spine; degenerative joint disease of the right knee; and interstitial cystitis.[9] Tr. 14-15.

4. Souris does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 15-16.

5. Souris has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can frequently operate foot controls with the left and right lower extremities; can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and can never climb ladders, ropes and scaffolds. Tr. 16-21.

6. Souris is able to perform past relevant work as a cashier-checker. Tr. 22.

Based on the foregoing, the ALJ determined Souris had not been under a disability, as defined in the Social Security Act, from December 15, 2012, through the date of the decision. Tr. 22.

### V. Law & Analysis

**A.   Standard of review**

---

[8] The ALJ's findings are summarized.

[9] The ALJ also found that Souris also had non-severe impairments. Tr. 15.

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     The Court finds that reversal and remand is warranted**

Souris raises one argument in this appeal. She argues that the ALJ erred in his evaluation of Souris' statements regarding her urinary frequency and by failing to include limitations in the RFC to account for Souris' interstitial cystitis.

As explained in SSR 15-1p, "IC [interstitial cystitis] is a complex genitourinary disorder involving recurring pain or discomfort in the bladder and pelvic region." 2015 WL 1292257, *2. SSR 15-1p provides guidance for evaluating claims involving interstitial cystitis. *Id*. at *1. As

indicated in SSR 15-1p, "[t]reatments for IC are mostly directed at symptom control . . . [and] [t]reatment is not effective for everyone because response varies among patients." *Id.* at *3. Symptoms of IC include but are not limited to "chronic pain and urinary urgency or frequency or both[.]" *Id.* at *4. In cases involving interstitial cystitis, longitudinal clinical records serve to document the presence of signs and laboratory findings and limitations over time. *Id.* at *5. Such records are helpful because "symptoms, signs and laboratory findings of IC may fluctuate in frequency and severity and may continue over a period of months or years." *Id*.

The process for evaluating a claimant's statements regarding symptoms and functional limitations associated with IC is similar to the two step-process used to for evaluation of symptoms generally. *Compare* SSR 15-1p, 2015 WL 1292257 *with* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017); *see also Allison v. Berryhill*, No. 5:16-CV-2388, 2017 WL 3701688, at *7 (N.D. Ohio June 23, 2017), *report and recommendation adopted sub nom. Allison v. Comm'r of Soc. Sec. Admin.*, 2017 WL 3687394 (N.D. Ohio Aug. 25, 2017) ("Part IV of that SSR [SSR 15-1p] sets forth a two-step symptom evaluation process for IC, which largely mirrors the two-step process used in evaluating the credibility of all symptoms.").

First, "[t]here must be medical signs or laboratory findings that show the person has an MDI(s) which we could reasonably expect to produce the pain or other symptoms alleged." 2015 WL 1292257, *7. Second,

> After finding that the MDI could reasonably be expected to produce the alleged symptoms, we evaluate the intensity and persistence of the person's symptoms and determine the extent to which they limit the person's functional capacity for work. In evaluating the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities; medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.

14

2015 WL 1292257, *7.

An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference . . . Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

In this case, the ALJ found that interstitial cystitis was a severe impairment. Tr. 14. In proceeding with the two-step process for evaluation of Souris' symptoms, the ALJ found that Souris' medically determinable impairments could reasonably be expected to cause the alleged symptoms. Tr. 17. However, the ALJ concluded that Souris' statements regarding the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the evidence of record. Tr. 17.

Although an ALJ's assessment of a claimant's subjective statements regarding her symptoms is often difficult to challenge, here the ALJ's analysis falls short and leaves this Court unable to conduct a meaningful assessment as to whether the evaluation of Souris' symptoms relating to her IC and/or the RFC assessment are supported by substantial evidence.

The ALJ concluded that Souris' "alleged urinary frequency [could] be accommodated by regular work breaks[]" and "the record warrant[ed] no further limitations." Tr. 21. The ALJ does not explain how regular work breaks are sufficient to accommodate Souris' urinary frequency. Furthermore, in reaching this conclusion, the ALJ does not acknowledge Souris' testimony at both hearings wherein she indicated that she has to use the bathroom during the day every 30-35 minutes. Tr. 58, 98, 103. Also, the ALJ does not acknowledge or note that during both hearings Souris had to excuse herself to use the restroom. Tr. 62, 115.

Instead, the ALJ's description of Souris' subjective allegations regarding her symptoms was that "[s]he has . . . reported experiencing frequent urination[,]" and "[s]he has also indicated that she needs to use the bathroom approximately once every hour (Hearing Testimony)." Tr. 17. This description of Souris' allegations and testimony is vague and/or not supported by the record. For example, as noted above, Souris' testimony regarding needing to use the bathroom once every hour related to her need to use the bathroom during the night. Tr. 58. With respect to her urinary frequency during the day, she testified that she used the bathroom almost every half hour. Tr. 58, 98, 103.

The failure to specifically acknowledge or note that the actual frequency which Souris asserts she has to urinate during the day is problematic in light of the VE's testimony which was that, if a hypothetical "individual needed to take five-minute breaks to use the restroom three times in every two-hour time period[,]" there would be no work. Tr. 65. In light of this VE testimony and without a more complete explanation by the ALJ as why he found Souris' statements regarding her daytime urinary frequency, i.e., every 30-35 minutes, not consistent with the record and/or how her urinary frequency, even if once every hour rather than once every half an hour, can be accommodated by regular work breaks, the Court is unable to assess whether the RFC is supported by substantial evidence.

With respect to the ALJ's finding that Souris "did not report any significant urological symptoms for much of the period at issue[,]" (Tr. 20), Souris acknowledges that the first reference to urinary problems was in March 2015 and therefore her IC issues do not date back to her alleged 2012 onset date. Doc. 17, p. 12. However, she contends that that fact relates to the issue of onset but it does not "undermine her experience of urinary frequency since March 2015." Doc. 17, p. 12. The Court agrees. While the record may support a finding of non-

disability from the alleged onset date of December 15, 2012, up until March 2015, the ALJ, on remand, shall more clearly identify the period of time that his findings regarding interstitial cystitis relate to and provide a more complete symptom analysis relating to Souris' interstitial cystitis for the period of time starting in March 2015 through the close of the relevant period.

For the reasons explained herein, the Court finds that the ALJ either overlooked or misconstrued evidence relating to Souris' subjective allegations relating to urinary frequency and, without a more thorough analysis, the Court is unable to conduct a meaningful assessment as to whether the ALJ's assessment of Souris' subjective allegations regarding her urinary frequency and/or the RFC assessment are supported by substantial evidence.

## VI. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

Dated: June 30, 2021  /s/ *Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge